IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION: FRANKFORT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO.: |
| | ) | |
| v. | ) | |
| | ) | |
| KENTUCKY UTILITIES COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

The United States of America, by and through its attorneys, by authority of the Attorney

General of the United States and acting at the request and on behalf of the Administrator of the

United States Environmental Protection Agency ("EPA"), allege the following:

### NATURE OF ACTION

1.      This is a civil action brought against Kentucky Utilities Company ("Defendant"

or "KU") for injunctive relief and the assessment of civil penalties for violations of the Clean Air

Act ("CAA" or "Act"), 42 U.S.C. §§ 7401 to 7671q, implementing regulations and the Kentucky

State Implementation Plan ("SIP") as set out in the Kentucky Administrative Regulations

(KAR), Title 401 Chapters 51- 68.  The Energy and Environment Cabinet Department for

Environmental Protection, Division for Air Quality ("Kentucky Department of Air Quality") is

charged with the statutory duty of enforcing its SIP and the applicable regulations.  The alleged

violations occurred and are occurring at Kentucky Utilities' coal-fired electrical power plant located in Ghent, Kentucky (hereinafter "Ghent Station").

## JURISDICTION AND VENUE

2.     This Court has jurisdiction over the subject matter of this action pursuant to Clean Air Act Section 113(b), 42 U.S.C. § 7413(b), and 28 U.S.C. §§ 1331, 1345, and 1355.

3.     Venue is proper in this district pursuant to Clean Air Act Section 113(b), 42 U.S.C. § 7413(b), and 28 U.S.C. §§ 1391(b) and 1395(a) because the violations of the Act giving rise to this claim occurred in this district and Defendant does business and is found in this district.

## NOTICES

4.     Pursuant to Clean Air Act Section 113(a), 42 U.S.C. § 7413(a), EPA notified Kentucky Utilities of the violations in this Complaint more than 30 days prior to its filing.

## AUTHORITY

5.     Authority to bring this action is vested in the Attorney General of the United States pursuant to 28 U.S.C. §§ 516 and 519 and 42 U.S.C. § 7605.

## DEFENDANT

6.     Defendant Kentucky Utilities ("KU"), is a corporation organized under the laws of the Commonwealth of Kentucky and is registered to do business in Kentucky.  KU's headquarters and principal place of business is in Lexington, Kentucky.  KU is a wholly owned subsidiary of E.ON U.S. LLC, which maintains its headquarters and principal place of business in Lexington, Kentucky.  E.ON U.S. is owned by PPL Corporation of Allentown, Pennsylvania.

7.     Kentucky Utilities is a corporation and therefore is a "person" as defined in Clean Air Act Section 302(e), 42 U.S.C. § 7602(e) and Kentucky's SIP, 401 KAR 59:001, Section 1 (90); 401 KAR 51:001; Kentucky Revised Statutes ("KRS") 224.01-010.

CLEAN AIR ACT STATUTORY AND REGULATORY BACKGROUND

8.     The Clean Air Act establishes a regulatory scheme designed to protect and enhance the quality of the nation's air so as to promote the public health and welfare and the productive capacity of its population.  CAA Section 101(b)(1); 42 U.S.C. § 7401(b)(1).

State Implementation Plan

9.      The Clean Air Act requires EPA to publish and maintain "national ambient air quality standards" ("NAAQS") for air pollutants.  42 U.S.C. § 7409(a).  EPA has promulgated the NAAQS pursuant to the Act, and they are set forth in 40 C.F.R. Part 50.

10.     The Clean Air Act requires each state to adopt a plan for the implementation, maintenance, and enforcement of the NAAQS and to submit that plan to EPA for approval.  42 U.S.C. § 7410.  Upon EPA's approval, state plan provisions become part of the "applicable implementation plan" for the state within the meaning of 42 U.S.C. § 7602(q).

11.     The Commonwealth of Kentucky has an "applicable implementation plan" that has been approved by EPA.  40 C.F.R. § 52.919.  Kentucky's approved plan is hereinafter called the "State Implementation Plan" or "SIP."

12.     Kentucky's SIP includes regulations that have been promulgated by Kentucky as set out in KAR, Title 401 Chapter 51.  Many provisions of Kentucky's SIP are based on or identical to regulations that have been promulgated by EPA under the Clean Air Act.  This

3

Complaint cites to the Kentucky regulations and the corresponding federal regulations. Kentucky's SIP includes the following three regulations:

      401 KAR 59:015 ("New indirect heat exchangers");

      401 KAR 61:015 ("Existing indirect heat exchangers"); and

      401 KAR 51:017 ("Prevention of significant deterioration of air quality").

<u>Rules for New Indirect Heat Exchangers</u>

13.     The Clean Air Act required EPA to promulgate standards of performance for categories of new and modified stationary sources that may emit air pollutants. 42 U.S.C. § 7411(b). It is unlawful for any person to operate such a source in violation of applicable standards of performance. 42 U.S.C. § 7411(e).

14.     EPA has promulgated New Source Performance Standard ("NSPS") regulations under 42 U.S.C. § 7411(b), including 40 C.F.R. Part 60, Subpart D ("Standards of Performance for Fossil-Fuel-Fired Steam Generations for Which Construction is Commenced after August 17, 1971"). In relevant part, these regulations require that no owner or operator of an affected facility shall discharge gases which "exhibit greater than 20 percent opacity except for one six-minute period per hour of not more than 27 percent opacity." 40 C.F.R. 60.42(a)(2).

15.     Kentucky's SIP includes similar regulations. On July 12, 1982, EPA approved Kentucky's new source performance standards for new or modified indirect heat exchangers found at 401 KAR 59:015 § 4(2)(a). 40 C.F.R. 52.920; 47 Fed. Reg. 30059. Kentucky's standards reflect the standards published by EPA and impose a limit of 20% opacity for emissions from new indirect heat exchangers:

[A]n indirect heat exchanger subject to this administrative regulation shall not cause emissions of particulate matter in excess of . . . [t]wenty (20) percent opacity except . . . [f]or indirect heat exchangers with heat input capacity of 250 million BTU per hour or more, a maximum of twenty-seven (27) percent opacity shall be allowed for one (1) six (6) minute period in any sixty (60) consecutive minutes . . . .

401 KAR 59:015 § 4(2)(a).

<u>Rules for Existing Indirect Heat Exchangers</u>

16.     The Clean Air Act also requires EPA to promulgate regulations whereby the states establish standards of performance for existing stationary sources that may emit air pollutants.  42 U.S.C. § 7411(d).

17.      Kentucky's SIP includes regulations setting out such standards of performance for existing stationary sources.  On July 12, 1982, EPA approved Kentucky's new source performance standards for existing indirect heat exchangers found at 401 KAR 61:015.  40 C.F.R. 52.920, 47 Fed. Reg. 30059-01.  The Kentucky regulations impose a 40% opacity limit for emissions from existing indirect heat exchangers:

[B]efore the applicable classification date . . . . August 17, 1971, for affected facilities with a capacity of more than 250 million BTU per hour heat input . . . . [N]o owner or operator of an affected facility . . . shall cause to be discharged into the atmosphere from that affected facility . . . [e]missions which exhibit greater than forty (40) percent opacity in regions classified as Priority II or II with respect to particulate matter except: . . . for cyclone or pulverized fire indirect heat exchangers a maximum of sixty (60) percent opacity shall be permissible for not

5

more than one (1) six (6) minute period in any sixty (60) consecutive minutes; . . .

[and likewise] during cleaning the fire box or cleaning soot . . . during cleaning of

the grates for not more than three (3) consecutive minutes in any sixty (60)

consecutive minutes . . . . [and] during building a new fire for the period required

to bring the boiler up.

401 KAR 61:015 (3).

Rules for Prevention of Significant Deterioration of Air Quality

18.     EPA has promulgated "prevention of significant deterioration" ("PSD") rules.

The PSD rules require certain facilities undergoing "major modifications" to apply for a

preconstruction permit and apply the best available control technology ("BACT") for regulated

pollutants.  42 U.S.C. §§ 7470-7479.

19.     The Commonwealth of Kentucky implemented the PSD regulations found in the

Clean Air Act, 42 U.S.C. § 7475, in its SIP, at 401 KAR 51:017.  On September 1, 1989, EPA

approved Kentucky's SIP provisions for PSD.  52 C.F.R. 52.920; 54 Fed. Reg. 56307.

20.     Kentucky's PSD standards apply to major stationary sources or major

modifications for which construction is commenced after September 22, 1982.  401 KAR

51:017, Section 1; 42 U.S.C. § 7407(d)(1)(A)(ii).  Major sources in attainment areas must obtain

PSD permits prior to commencing construction.  401 KAR 51:017, Section 1(3); 42 U.S.C.

§ 7475(a).

21.     Kentucky's SIP defines "construction" to include any physical change or change

in the method of operation which would result in a change in actual emissions.  401 KAR

51:001, Section 1 (52)(b); 40 C.F.R. § 52.21 (b)(8).

22.     Kentucky's SIP defines "major modification" as a physical change in or change in the method of operation of a major stationary source that would result in a significant net emissions increase of a regulated New Source Review ("NSR") pollutant.  401 KAR 51:001, Section 1 (116); 40 C.F.R. § 52.21 (b)(2).

23.     "Net Emissions Increase" means, for any regulated NSR pollutant emitted by a major stationary source, the amount by which the sum of subparagraphs 1 and 2 exceed zero:

        1.  An increase in actual emissions from a particular physical change or change in method of operation of a stationary source;

        2.  Any other increases and decreases in actual emissions at the major stationary source that are contemporaneous with the particular change and are otherwise creditable. 401 KAR 51:001 Section 1 (146)(a); 40 C.F.R. § 52.21 (b)(3)(i).

24.     "Significant", in reference to net emissions increase, means a rate of emissions that would equal or exceed a given rate given in the table found in this section.  The significance rate for sulfuric acid mist is an increase of 7 tons per year.  401 KAR 51:001 Section 1 (221)(a); 40 C.F.R. § 52.21 (b)(23).

25.     "Actual emissions" means the actual rate of emissions of a regulated NSR pollutant from an emissions unit as determined by:

        a.  Actual emissions as of a particular date equals the average rate, in tons per year, at which the unit actually emitted the pollutant during a consecutive 24 month period that precedes that date and is representative of normal source operation.

        b.  The cabinet may presume that source-specific allowable emissions for the unit are equivalent to the actual emissions of the unit.

7

c.  For an emissions unit that has not begun normal operations on the particular date, actual emissions equals the potential to emit of the unit on that date.  401 KAR 51:001 Section 1 (2); 40 C.F.R. § 52.21 (b)(41).

26.     "BACT" is defined by Kentucky as "an emissions limitation, including a visible emission standard, based on the maximum degree of reduction for each regulated NSR pollutant that will be emitted from a proposed major stationary source or major modification that:

a.  Is determined by the cabinet on a case-by-case basis after taking into account energy, environmental, and economic impacts and other costs . . . [that];

b.  Does not result in emissions of a pollutant that would exceed the emissions allowed by an applicable standard of 40 C.F.R. Parts 60 and 61; and (c) [i]s satisfied by a design, equipment, work practice, or operational standard or combination of standards approved by the cabinet, . . . ."  401 KAR 51:001 Section 25; 40 C.F.R. § 52.21 (b)(12).

27.     Section 167 of the Clean Air Act, 42 U.S.C. § 7477, authorizes the Administrator to issue an order or seek injunctive relief, "as necessary to prevent the construction or modification of a major emitting facility which does not conform to the requirements of this part [Part C of the Act, 42 U.S.C. §§ 7470-7491]."

<u>Title V Permits</u>

28.     "Title V" of the Clean Air Act, 42 U.S.C. §§ 7661-7661f, establishes an operating permit program for certain sources, including "major sources" and any source required to have a PSD permit.  42 U.S.C. § 7661a(a).  EPA's regulations implementing the Title V permit program are set forth in 40 C.F.R. Part 70 (State Operating Permit Programs).

8

29.     It is unlawful for any person to violate any requirement of a permit issued under Title V or to operate a major source except in compliance with a permit issued by a permitting authority under Title V.  42 U.S.C. § 7661a(a).

30.     The requirement to obtain and operate pursuant to a Title V permit is further set forth in Kentucky's "applicable implementation plan."  401 KAR 52.020.

31.     Sources subject to Title V are required to submit timely and complete applications and obtain and comply with an operating permit that: 1) contains such conditions necessary to assure compliance with the applicable requirements, 2) identifies all applicable requirements the source is subject to (including PSD requirements such as BACT analysis and installation) and 3) certifies compliance with all applicable requirements, and where a source is not meeting requirements, contains a plan for coming into compliance.  42 U.S.C. §§ 7661b and 7661c(a); 40 C.F.R. §§ 70.1 (1992); 70.5 (1992) and 70.6 (1992).

<u>Enforcement Provisions</u>

32.     Section 113(b) of the Clean Air Act, 42 U.S.C. § 7413(b)(1), authorizes EPA to initiate a judicial enforcement action for a permanent or temporary injunction, and/or for a civil penalty against any person whenever such person has violated, or is in violation of, any requirement or prohibition of a SIP or permit.  Section 113(b)(2), 42 U.S.C. § 7413(b)(2), authorizes EPA to initiate a judicial enforcement action for a permanent or temporary injunction, and/or for a civil penalty against any person whenever such person has violated, or is violation of, requirements of the Clean Air Act other than those specified in Section 113(b)(1).

33.     Pursuant to Clean Air Act Section 113(a) and (b), 42 U.S.C. § 7413(a) and (b), SIP requirements that EPA has approved are federally enforceable.

9

34.     Failure to comply with any approved regulatory provision of a SIP renders the person or the governmental entity subject to enforcement action under Clean Air Act Section 113, 42 U.S.C. § 7413.  40 C.F.R. § 52.23.

35.     Section 113(b) of the Act, 42 U.S.C. § 7413(b), authorizes the Administrator to initiate a judicial enforcement action for a permanent or temporary injunction, and/or for a civil penalty of up to $27,500 per day for each violation occurring on or after January 31, 1997, and $32,500 per day for each such violation occurring on or after March 15, 2004.

<u>KENTUCKY UTILITIES' OPERATIONS</u>

36.     The Ghent Station is located at 9485 Highway 42 East in Ghent, Carroll County, Kentucky.

37.     Ghent Station is located adjacent to low income communities.

38.     Ghent Station consists of four large coal-fired units that generate approximately 2,200 Megawatts of electricity.

39.     KU is an "owner or operator" because it owns, leases, operates, controls, and/or supervises Ghent Station Units 1, 2, 3, and 4.  401 KAR 51:001 Section 1; 401 KAR 59:001 Section 1, 401 KAR 61:001 Section 1.

40.     Unit 1 of Ghent Station began operating in 1973.

41.     Kentucky issued Ghent Station a Title V permit (No. V-05-043) on June 17, 1998, under 401 KAR 52.020.  Kentucky issued a renewed permit on October 31, 2007.  The permit is called the "Air Quality Permit."

42.     Ghent Station Units 2, 3, and 4 are regulated pursuant to 40 CFR 60.42(a)(2) of the Clean Air Act and 401 KAR 59:015 of Kentucky's SIP (New Indirect Heat Exchangers).

43.     Ghent Station Unit 1 is regulated through 401 KAR 61:015 (Existing Indirect Heat Exchangers).

44.     In 2002, KU filed a minor permit revision with the Commonwealth to install selective catalytic reduction devices ("SCRs") in three of its coal-fired boiler units at the plant (Unit 1, Unit 3, and Unit 4).

45.     KU installed the selective catalytic reduction devices in Unit 3 in 2003 and Unit 1 and Unit 4 in 2004.

46.     In January 2005, KU requested approval and filed an application for a Tile V permit change to install wet flue gas desulfurization ("WFGD") devices in Ghent Station Units 2, 3, and 4.

47.     In June 2007, KU completed installation of the WFGD and switched the fuel source to a higher sulfur content coal at Ghent Station Unit 3.

48.     In 2008, KU completed installation of the WFGD and switched the fuel source to a higher sulfur content coal at Ghent Station Unit 4.

49.     In April 2009, KU completed installation of the WFGD and switched the fuel source to a higher sulfur content coal at Ghent Station Unit 2.

50.     The burning of coal results in the formation of sulfuric acid mist ("SAM"), a regulated pollutant under the federal and state-implemented prevention of significant deterioration ("PSD") program.

51.     Sulfur trioxide (SO3) is formed during the combustion of coal. SO3 is the precursor or anhydride of sulfuric acid (H2SO4). H2SO4 forms when SO3 combines with water (H2O).

52.     Sulfuric acid mist emissions include both SO3 and H2SO4 emissions.

53.     SO3 and H2SO4 are a regulated pollutant under the federal and state-implemented PSD programs.

54.     There is a correlation between the sulfur content in coal burned at an indirect heat exchanger unit and the emissions of SAM from that indirect heat exchanger unit.

## FIRST CLAIM FOR RELIEF

### (Unit 3 Opacity Violations in 2007)

55.     The allegations of Paragraphs 1 through 54 are incorporated herein by reference.

### Facts related to Unit 3 Opacity Violations

56.     On June 20, 2007, an EPA inspector measured the opacity of the emissions coming from the Ghent Station Unit 3 stack.

57.     On June 20, 2007, the EPA inspector used Method 9 to measure the opacity of the emissions coming from the Ghent Station Unit 3 stack.

58.     The June 20, 2007, the EPA inspector's Method 9 stack reading indicated that, at the edge of the stack's vapor plume, the 6 minute average opacity from the Ghent Station Unit 3 stack was 91.9% for the first period observed

59.     The June 20, 2007, the EPA inspector's Method 9 stack reading indicated that, at the edge of the stack's vapor plume, the 6 minute average opacity from the Ghent Station Unit 3 stack was 89.8% for the second period observed.

60.     The Kentucky Department of Air Quality conducted additional opacity tests on the emissions coming from the Ghent Station Unit 3 stack the week of July 2, 2007.

61.     The Kentucky Department of Air Quality used Method 9 on July 2, 2007.

12

62.     The Kentucky Department of Air Quality's opacity tests on the emissions coming from the Ghent Station Unit 3 stack on the week of July 2, 2007, showed that the emissions coming from the Ghent Station Unit 3 stack exceeded 40% opacity.

63.     Sulfuric acid mist (SAM) controls at Ghent Station Unit 3 failed to function properly during most of the period from May 1, 2007 to September 31, 2007.

64.     Sulfuric acid mist (SAM) controls at Ghent Station Unit 3 failed to function properly, resulting in high stack opacity at Ghent Station Unit 3 during most or all of the period from May 1, 2007 to September 31, 2007.

**Claim 1(A):  Unit 3 Opacity Violated the Kentucky Permit and Title V of the CAA**

65.     KU's Ghent Station "Air Quality Permit" applies to Ghent Station Unit 3.

66.     KU's "Air Quality Permit" states:

Pursuant to 401 KAR 59:015, Section 4(2) and 40 CFR 60.42(a)(2) of Subpart D, emissions shall not exceed twenty (20) percent opacity based on a six-minute average except that a maximum of twenty-seven (27) percent opacity shall be permissible for not more than one (1) six (6) minute period in any sixty (60) consecutive minutes.

KU's "Air Quality Permit", p. 16.

67.     The June 20, 2007 Method 9 stack opacity readings discussed above were higher than the opacity limits set by KU's "Air Quality Permit."

68.     On June 20, 2007, KU violated the opacity limits set by its "Air Quality Permit."

69.     On June 20, 2007, KU violated Title V, 42 U.S.C. § 7661a(a), of the Clean Air Act.

70.     On July 2, 2007, KU violated the opacity limits set by its "Air Quality Permit."

13

71.    On July 2, 2007, KU violated Title V, 42 U.S.C. § 7661a(a), of the Clean Air Act.

72.    KU violated the opacity limits set by its "Air Quality Permit" during most or all of the period from May 1, 2007 to September 31, 2007 at Ghent Station Unit 3.

73.    KU violated Title V of the Clean Air Act during most or all of the period from May 1, 2007 to September 31, 2007 at Ghent Station Unit 3.

74.    On information belief, KU has committed additional violations of the opacity limits set by its "Air Quality Permit" at Ghent Station Unit 3.

75.    On information and belief, KU has committed additional violations of Title V of the Clean Air Act at Ghent Station Unit 3.

**Claim 1(B):  Unit 3 Opacity Violated the Rules for New Indirect Heat Exchangers in the Kentucky SIP, and Violated the CAA**

76.    KU's "Air Quality Permit" states that 401 KAR 59:015, Section 4 (2) applies to Ghent Station Unit 3.

77.    401 KAR 59:015, Section 4 (2) in fact applies to Ghent Station Unit 3.

78.    Ghent Station Unit 3 is a piece of equipment, apparatus, or contrivance used for the combustion of fuel in which the energy produced is transferred to its point of usage through a fluid medium that does not come in contact with or add to the products of combustion.

79.    Ghent Station Unit 3 is an indirect heat exchanger.

80.    Ghent Station Unit 3 has a heat input capacity greater than one million BTU per hour.

81.    Construction of Ghent Station Unit 3 commenced after August 17, 1971.

14

82.     The opacity of emissions from Ghent Station Unit 3 is regulated pursuant to 401 KAR 59:015.

83.     On June 20, 2007, KU violated the opacity limits set by 401 KAR 59:015.

84.     On July 2, 2007, KU violated the opacity limits set by 401 KAR 59:015.

85.     KU violated the opacity limits set by 401 KAR 59:015 during most or all of the period from May 1, 2007 to September 31, 2007 at Ghent Station Unit 3.

86.     On information and belief, KU has committed additional violations of the opacity limits set by 401 KAR 59:015 at Ghent Station Unit 3.

87.     401 KAR 59:015, Section 4(2) is part of Kentucky's "applicable implementation plan." Each violation of 401 KAR 59:015 is also a violation of the CAA.

**Claim 1(C):  Unit 3 Opacity Violated 40 C.F.R. § 60.42(a)(2) and the CAA**

88.     KU's "Air Quality Permit" states that 40 C.F.R. § 60.42(a)(2) of Subpart D applies to Ghent Station Unit 3.

89.     40 C.F.R. § 60.42(a)(2) in fact applies to Ghent Station Unit 3.

90.     The opacity of emissions from Ghent Station Unit 3 is regulated pursuant to 40 C.F.R. § 60.42(a)(2).

91.     On June 20, 2007, KU violated the opacity limits set by 40 C.F.R. § 60.42(a)(2).

92.     On July 2, 2007, KU violated the opacity limits set by 40 C.F.R. § 60.42(a)(2).

93.     KU violated the opacity limits set by 40 C.F.R. § 60.42(a)(2) during most or all of the period from May 1, 2007 to September 31, 2007 at Ghent Station Unit 3.

94.     On information and belief, KU has committed additional violations of the opacity limits set by 40 CFR 60.42(a)(2) at Ghent Station Unit 3.

15

95.     Each violation of 40 C.F.R. § 60.42(a)(2) is also a violation of the CAA.

**Conclusion of First Claim for Relief**

96.     Pursuant to Clean Air Act Section 113(b), 42 U.S.C. section 7413(b), for each violation referred to in the preceding paragraphs, KU is subject to injunctive relief and civil penalties of up to $32,500 per day for each violation occurring on or after March 15, 2004.

**<u>SECOND CLAIM FOR RELIEF</u>**

**(Unit 1 Opacity Violations)**

97.     The allegations of Paragraphs 1 through 96 are incorporated herein by reference.

**Facts related to Unit 1 Opacity Violations**

98.     On June 20, 2007, an EPA inspector measured the opacity of the emissions coming from the Ghent Station Unit 1 stack.

99.     On June 20, 2007, an EPA inspector used Method 9 to measure the opacity of the emissions coming from the Ghent Station Unit 1 stack.

100.     The June 20, 2007, the EPA inspector's Method 9 stack reading indicated that, at the edge of the stack's vapor plume, the 6 minute average opacity from the Ghent Station Unit 1 stack was 91.9% for the first period observed

101.     The June 20, 2007, the EPA inspector's Method 9 stack reading indicated that, at the edge of the stack's vapor plume, the 6 minute average opacity from the Ghent Station Unit 1 stack was 89.8% for the second period observed.

102.     The Kentucky Department of Air Quality conducted additional opacity tests on the emissions coming from the Ghent Station Unit 1 stack the week of July 2, 2007.

103.    The Kentucky Department of Air Quality's opacity tests on the emissions coming from the Ghent Station Unit 1 stack on the week of July 2, 2007, showed that the emissions coming from the Ghent Station Unit 1 stack exceeded 40% opacity.

104.    Sulfuric acid mist (SAM) controls at Ghent Station Unit 1 failed to function properly during most of the period from May 1, 2007 to September 31, 2007.

105.    Sulfuric acid mist (SAM) controls at Ghent Station Unit 1 failed to function properly, resulting in high stack opacity at Ghent Station Unit 1 during most or all of the period from May 1, 2007 to September 31, 2007.

**Claim 2(A):  Unit 1 Opacity Violated the Kentucky Permit and Title V of the CAA**

106.    KU's Ghent Station "Air Quality Permit"applies to Ghent Station Unit 1.

107.    KU's "Air Quality Permit" states:

Pursuant to 401 KAR 61:015, Section 4(4) and Regulation No. 7, emissions shall not exceed forty (40) percent opacity based on a six-minute average except that a maximum of sixty (60) percent opacity is allowed for a period or aggregate periods of not more than six minutes in any sixty minutes during building a new fire, cleaning the firebox, or blowing soot.

KU's "Air Quality Permit", p. 3.

108.    The Method 9 stack opacity readings discussed above were higher than the opacity limits set by KU's "Air Quality Permit."

109.    On June 20, 2007, KU violated the opacity limits set by its "Air Quality Permit."

110.    On June 20, 2007, KU violated Title V, 42 U.S.C. § 7661a(a), of the Clean Air Act.

111.    On July 2, 2007, KU violated the opacity limits set by its "Air Quality Permit."

112.    On July 2, 2007, KU violated Title V, 42 U.S.C. § 7661a(a), of the Clean Air Act.

113.    KU violated the opacity limits set by its "Air Quality Permit" during most or all of the period from May 1, 2007 to September 31, 2007 at Ghent Station Unit 1.

114.    KU violated Title V of the Clean Air Act during most or all of the period from May 1, 2007 to September 31, 2007 at Ghent Station Unit 1.

115.    On information belief, KU has committed additional violations of the opacity limits set by its "Air Quality Permit" at Ghent Station Unit 1.

116.    On information and belief, KU has committed additional violations of Title V of the Clean Air Act at Ghent Station Unit 1.

**Claim 2(B):  Unit 1 Opacity Violated the Rules for New Indirect Heat Exchangers in the Kentucky SIP, and Violated the CAA**

117.    KU's "Air Quality Permit" states that 401 KAR 61:015, Section 4 (4) applies to Ghent Station Unit 1.

118.    401 KAR 61:015, Section 4 (4) in fact applies to Ghent Station Unit 1.

119.    Ghent Station Unit 1 is a piece of equipment, apparatus, or contrivance used for the combustion of fuel in which the energy produced is transferred to its point of usage through a fluid medium that does not come in contact with or add to the products of combustion.

120.    Ghent Station Unit 1 is an indirect heat exchanger.

121.    Ghent Station Unit 1 is has a heat input capacity greater than one million BTU per hour.

18

122.    Construction of Ghent Station Unit 1 commenced prior to August 17, 1971.

123.    The opacity of emissions from Ghent Station Unit 1 is regulated pursuant to 401 KAR 61:015. § 4(4),and Kentucky Air Pollution Control Commission Regulation 7, entitled "Prevention and Control of Emissions of Particulate Matter from Combustion of Fuel in Indirect Heat Exchangers."

124.    On June 20, 2007, KU violated the opacity limits set by 401 KAR 61:015 section 4(4) and Kentucky Air Pollution Control Commission Regulation 7 at Ghent Station Unit 1..

125.    On July 2, 2007, KU violated the opacity limits set by 401 KAR 61:015 section 4(4) and Kentucky Air Pollution Control Commission Regulation 7 at Ghent Station Unit 1..

126.    KU violated the opacity limits set by 401 KAR 61:015 section 4(4) and Kentucky Air Pollution Control Commission Regulation 7 during most or all of the period from May 1, 2007 to September 31, 2007 at Ghent Station Unit 1.

127.    On information and belief, KU has committed additional violations at Ghent Station Unit 1 of the opacity limits set by 401 KAR 61:015 § 4(4) and Kentucky Air Pollution Control Commission Regulation 7.

128.    401 KAR 61:015 § 4(4) is part of Kentucky's "applicable implementation plan." Each violation of 401 KAR 61:015 § 4(4) is also a violation of the CAA.

### Conclusion of Second Claim for Relief

129.    Pursuant to Clean Air Act Section 113(b), 42 U.S.C. section 7413(b), for each violation referred to in the preceding paragraphs, KU is subject to injunctive relief and civil penalties of up to $32,500 per day for each violation occurring on or after March 15, 2004.

### THIRD CLAIM FOR RELIEF

19

**(WFGD and Fuel Change at Unit 3 in 2007)**

130.   Paragraphs 1 through 96 are incorporated herein by reference.

**Facts related to the WFGD and Fuel Change at Unit 3**

131.   Ghent Station Unit 3 is a stationary source of air pollutants.

132.   Ghent Station Unit 3 emits 100 tons per year of sulfuric acid mist ("SAM").

133.   Ghent Station Unit 3 has the potential to emit 100 tons per year or more of SAM.

134.   Ghent Station Unit 3 is a fossil fuel-fired steam electric plant

135.   Ghent Station Unit 3 is a fossil fuel-fired steam electric plant of more than 250 million BTU per hour heat input.

136.   Ghent Station Unit 3 emits SAM.

137.   SAM is a regulated pollutant under Kentucky's PSD program.

138.   In January 2005, KU requested approval and filed an application with Kentucky to install a wet flue gas desulfurization ("WFGD") device in Ghent Station Unit 3.

139.   In the January 2005 application, KU did not include any analysis of whether the installation of a WFGD would increase SAM emissions.

140.   In the January 2005 application, KU did not include any analysis of whether switching to higher sulfur content coal would increase SAM emissions.

141.   In June 2007, KU completed installation of the WFGD.

142.   In June 2007, or following, KU switched the fuel source at Ghent Station Unit 3 from a lower sulfur content coal to a higher sulfur content coal.

**Claim 3(A):  WFGD and Fuel Change at Unit 3 Violate the PSD Regulations and SIP**

143.    The installation of the wet flue gas desulferization device and switch from a lower sulfur content coal to a higher sulfur content coal at Ghent Station Unit 3 was a "physical change or change in the method of operation which would result in a change in actual emissions" at Ghent Station Unit 3.  401 KAR 51:0001, Section 1 (52)(b).

144.    The installation of the wet flue gas desulferization device and switch from a lower sulfur content coal to a higher sulfur content coal at Ghent Station Unit 3 resulted in an annual increase in SAM emissions from Ghent Station Unit 3.

145.    The "net emissions increase" of SAM was the result of "an increase in actual emissions from a particular change or change in method of operation" or was the result of "any other increases and decreases in actual emissions . . . that are contemporaneous with the particular change and are otherwise creditable."  401 KAR 51:001, Section 1.

146.    The installation of the wet flue gas desulferization device and switch from a lower sulfur content coal to a higher sulfur content coal at Ghent Station Unit 3 resulted in an annual increase in SAM emissions from Ghent Station Unit 3 of more than 7 tons per year.

147.    KU did not obtain a PSD or pre-construction permit from Kentucky prior to installing the wet flue gas desulferization device and switching from the lower sulfur content coal to the higher sulfur content coal at Ghent Station Unit 3.

148.    KU installed the wet flue gas desulferization device and switched from the lower sulfur content coal to the higher sulfur content coal at Ghent Station Unit 3 without a proposed PSD permit or PSD permit determining if potential Ghent Station Unit 3 emissions of SAM would increase by 7 tons per year or more.

149.     KU installed the wet flue gas desulferization device and switched from the lower sulfur content coal to the higher sulfur content coal at Ghent Station Unit 3 without a proposed PSD permit or PSD permit revision stating that Ghent Station Unit 3 would meet Kentucky's best achievable control technology (BACT) requirements for SAM emissions.

150.     KU installed the wet flue gas desulferization device and switched from the lower sulfur content coal to the higher sulfur content coal at Ghent Station Unit 3 without a revised Title V permit stating that Ghent Station Unit 3 would meet Kentucky's best achievable control technology (BACT) requirements for SAM emissions.

151.     KU violated the Prevention of Significant Deterioration standards ("PSD") set forth in Kentucky's SIP at Ghent Station at 401 KAR 51:017.

152.     Each day that KU operates Ghent Station Unit 3 without a PSD permit, KU violates the PSD standards set forth in Kentucky's SIP at 401 KAR 51:017.

**Claim 3(B): KU's Failure to Amend the Title V Permit for the**

**WFGD and Fuel Change at Unit 3 Violate Title V of the CAA**

153.     KU installed the wet flue gas desulferization device and switched from a lower sulfur content coal to a higher sulfur content coal at Ghent Station Unit 3 without obtaining a revised Title V permit in compliance with PSD regulations.

154.     KU did not obtain a revised Title V permit prior to installing the wet flue gas desulferization device and switching from the lower sulfur content coal to the higher sulfur content coal at Ghent Station Unit 3.

155.     KU violated Title V of the Clean Air Act.

156.     Each day that KU operates Ghent Station Unit 3 without a revised "Air Quality Permit," KU violates Kentucky law.

157.     Each day that KU operates Ghent Station Unit 3 without a Title V permit, KU violates Title V of the Clean Air Act.

### Conclusion of Third Claim for Relief

158.     Pursuant to Clean Air Act Section 113(b), 42 U.S.C. section 7413(b), for each violation referred to in the preceding paragraphs of this claim for relief, KU is subject to injunctive relief and civil penalties of up to $32,500 per day for each violation occurring on or after March 15, 2004.

### FOURTH CLAIM FOR RELIEF

### (WFGD and fuel change at Unit 4 in 2008)

159.     Paragraphs 1 through 54 are incorporated herein by reference.

### Facts about the WFGD and Fuel Change at Unit 4

160.     Ghent Station Unit 4 is a stationary source of air pollutants.

161.     Ghent Station Unit 4 emits 100 tons per year or more of sulfuric acid mist ("SAM").

162.     Ghent Station Unit 4 has the potential to emit 100 tons per year or more of SAM.

163.     Ghent Station Unit 4 is a fossil fuel-fired steam electric plant.

164.     Ghent Station Unit 4 is a fossil fuel-fired steam electric plant of more than 250 million BTU per hour heat input.

165.     Ghent Station Unit 4 emits SAM.

166.     SAM is a regulated pollutant under Kentucky's PSD program.

167.    In January 2005, KU requested approval and filed an application with Kentucky to install a wet flue gas desulfurization ("WFGD") device in Ghent Station Unit 4.

168.    In the January 2005 application, KU did not include any analysis of whether the installation of a WFGD would increase SAM emissions.

169.    In the January 2005 application, KU did not include any analysis of whether switching to higher sulfur content coal would increase SAM emissions.

170.    In 2008, KU completed installation of the WFGD at Unit 4.

171.    In 2008, or following, KU switched the fuel source at Ghent Station Unit 4 from a lower sulfur content coal to a higher sulfur content coal.

**Claim 4(A):  WFGD and Fuel Change at Unit 4 Violate the PSD Regulations and SIP**

172.    The installation of the wet flue gas desulferization device and the switch from a lower sulfur content coal to a higher sulfur content coal at Ghent Station Unit 4 was a "physical change or change in the method of operation which would result in a change in actual emissions" at Ghent Station Unit 4.  401 KAR 51:0001, Section 1 (52)(b)..

173.    The installation of the wet flue gas desulferization device and switch from the lower sulfur content coal to the higher sulfur content coal at Ghent Station Unit 4 resulted in an annual increase in SAM emissions from Ghent Station Unit 4.

174.    The "net emissions increase" of SAM was the result of "an increase in actual emissions from a particular change or change in method of operation" or was the result of "any other increases and decreases in actual emissions . . . that are contemporaneous with the particular change and are otherwise creditable."  401 KAR 51:001, Section 1.

24

175.    The installation of the wet flue gas desulferization device and switch from the lower sulfur content coal to the higher sulfur content coal at Ghent Station Unit 4 resulted in an annual increase in SAM emissions from Ghent Station Unit 4 of more than 7 tons per year.

176.    KU did not obtain a PSD or pre-construction permit from Kentucky prior to installing the wet flue gas desulferization device and switching from the lower sulfur content coal to the higher sulfur content coal at Ghent Station Unit 4.

177.    KU installed the wet flue gas desulferization device and switched from the lower sulfur content coal to the higher sulfur content coal at Ghent Station Unit 4 without a proposed PSD permit or PSD permit determining if potential Ghent Station Unit 4 emissions of SAM would increase by 7 tons per year or more.

178.    KU installed the wet flue gas desulferization device and switched from the lower sulfur content coal to the higher sulfur content coal at Ghent Station Unit 4 without a proposed PSD permit or PSD permit revision stating that Ghent Station Unit 4 would meet Kentucky's best achievable control technology (BACT) requirements for SAM emissions.

179.    KU installed the wet flue gas desulferization device and switched from the lower sulfur content coal to the higher sulfur content coal at Ghent Station Unit 4 without a revised Title V permit stating that Ghent Station Unit 4 would meet Kentucky's best achievable control technology (BACT) requirements for SAM emissions.

180.    KU violated the Prevention of Significant Deterioration standards ("PSD") set forth in Kentucky's SIP at Ghent Station at 401 KAR 51:017.

181.    Each day that KU operates Ghent Station Unit 4 without a PSD permit, KU violates the PSD standards set forth in Kentucky's SIP at 401 KAR 51:017.

**Claim 4(B): KU's Failure to Amend the Title V Permit for the**

**WFGD and Fuel Change at Unit 4 Violate Title V of the CAA**

182.    KU installed the wet flue gas desulferization device and switched from a lower sulfur content coal to a higher sulfur content coal at Ghent Station Unit 4 without obtaining a revised Title V permit in compliance with PSD regulations.

183.    KU did not obtain a revised Title V permit prior to installing the wet flue gas desulferization device and switching from the lower sulfur content coal to the higher sulfur content coal at Ghent Station Unit 4.

184.    KU violated Title V of the Clean Air Act.

185.    Each day that KU operates Ghent Station Unit 4 without a revised "Air Quality Permit," KU violates Kentucky law.

186.    Each day that KU operates Ghent Station Unit 4 without a Title V permit, KU violates Title V of the Clean Air Act.

**Conclusion of Fourth Claim for Relief**

187.    Pursuant to Clean Air Act Section 113(b), 42 U.S.C. section 7413(b), for each violation referred to in the preceding paragraphs of this claim for relief, KU is subject to injunctive relief and civil penalties of up to $32,500 per day for each violation occurring on or after March 15, 2004.

**FIFTH CLAIM FOR RELIEF**

**(WFGD and fuel change at Unit 2 in 2009)**

188.    Paragraphs 1 through 54 are incorporated herein by reference.

**Facts about the WFGD and Fuel Change at Unit 2**

26

189.    Ghent Station Unit 2 is a stationary source of air pollutants.

190.    Ghent Station Unit 2 emits 100 tons per year or more of sulfuric acid mist ("SAM").

191.    Ghent Station Unit 2 has the potential to emit 100 tons per year or more of SAM.

192.    Ghent Station Unit 2 is a fossil fuel-fired steam electric plant.

193.    Ghent Station Unit 2 is a fossil fuel-fired steam electric plant of more than 250 million BTU per hour heat input.

194.    Ghent Station Unit 2 emits SAM.

195.    SAM is a regulated pollutant under Kentucky's PSD program.

196.    In January 2005, KU requested approval and filed an application with Kentucky to install a wet flue gas desulfurization ("WFGD") device in Ghent Station Unit 2.

197.    In the January 2005 application, KU did not include any analysis of whether the installation of a WFGD would increase SAM emissions.

198.    In the January 2005 application, KU did not include any analysis of whether switching to higher sulfur content coal would increase SAM emissions.

199.    In April 2009, KU completed installation of the WFGD at Unit 2.

200.    In April 2009, or following, KU switched the fuel source at Ghent Station Unit 2 from a lower sulfur content coal to a higher sulfur content coal.

**Claim 5(A):  WFGD and Fuel Change at Unit 2 Violate the PSD Regulations and SIP**

201.    The installation of the wet flue gas desulferization device at Ghent Station Unit 2 and the switch from a lower sulfur content coal to a higher sulfur content coal was a "physical

change or change in the method of operation which would result in a change in actual emissions" at Ghent Station Unit 2.  401 KAR 51:0001, Section 1 (52)(b).

202.   The installation of the wet flue gas desulferization device and switch from the lower sulfur content coal to the higher sulfur content coal at Ghent Station Unit 2 resulted in an annual increase in SAM emissions from Ghent Station Unit 2.

203.   The "net emissions increase" of SAM was the result of "an increase in actual emissions from a particular change or change in method of operation" or was the result of "any other increases and decreases in actual emissions . . . that are contemporaneous with the particular change and are otherwise creditable."  401 KAR 51:001, Section 1.

204.   The installation of the wet flue gas desulferization device and switch from the lower sulfur content coal to the higher sulfur content coal at Ghent Station Unit 2 resulted in an annual increase in SAM emissions from Ghent Station Unit 2 of more than 7 tons per year.

205.   KU did not obtain a PSD or pre-construction permit from the state of Kentucky prior to installing the wet flue gas desulferization device and switching from the lower sulfur content coal to the higher sulfur content coal at Ghent Station Unit 2.

206.   KU installed the wet flue gas desulferization device and switched from the lower sulfur content coal to the higher sulfur content coal at Ghent Station Unit 2 without a proposed PSD permit or PSD permit determining if potential Ghent Station Unit 2 emissions of SAM would increase by 7 tons per year or more.

207.   KU installed the wet flue gas desulferization device and switched from the lower sulfur content coal to the higher sulfur content coal at Ghent Station Unit 2 without a proposed

PSD permit or PSD permit revision stating that Ghent Station Unit 2 would meet Kentucky's best achievable control technology (BACT) requirements for SAM emissions.

208.     KU installed the wet flue gas desulferization device and switched from the lower sulfur content coal to the higher sulfur content coal at Ghent Station Unit 2 without a revised Title V permit stating that Ghent Station Unit 2 would meet Kentucky's best achievable control technology (BACT) requirements for SAM emissions.

209.     KU violated the Prevention of Significant Deterioration standards ("PSD") set forth in Kentucky's SIP at Ghent Station at 401 KAR 51:017.

210.     Each day that KU operates Ghent Station Unit 2 without a PSD permit, KU violates the PSD standards set forth in Kentucky's SIP at 401 KAR 51:017.

### Claim 5(B): KU's Failure to Amend the Title V Permit for the WFGD and Fuel Change at Unit 2 Violate Title V of the CAA

211.     KU installed the wet flue gas desulferization device and switched from a lower sulfur content coal to a higher sulfur content coal at Ghent Station Unit 2 without obtaining a revised Title V permit in compliance with PSD regulations.

212.     KU did not obtain a revised Title V permit prior to installing the wet flue gas desulferization device and switching from the lower sulfur content coal to the higher sulfur content coal at Ghent Station Unit 2.

213.     KU violated Title V of the Clean Air Act.

214.     Each day that KU operates Ghent Station Unit 2 without a revised "Air Quality Permit," KU violates Kentucky law.

29

215.    Each day that KU operates Ghent Station Unit 2 without a Title V permit, KU violates Title V of the Clean Air Act.

### Conclusion of Fifth Claim for Relief

216.    Pursuant to Clean Air Act Section 113(b), 42 U.S.C. section 7413(b), for each violation referred to in the preceding paragraphs of this claim for relief, KU is subject to injunctive relief and civil penalties of up to $32,500 per day for each violation occurring on or after March 15, 2004.

### SIXTH CLAIM FOR RELIEF

### (SCR Installed at Unit 1 in 2004)

217.    Paragraphs 1 through 129 are incorporated herein by reference.

### Facts about the SCR Installation at Unit 1

218.    Ghent Station Unit 1 is a stationary source of air pollutants.

219.    Ghent Station Unit 1 emits 100 tons per year or more of sulfuric acid mist ("SAM").

220.    Ghent Station Unit 1 has the potential to emit 100 tons per year or more of SAM.

221.    Ghent Station Unit 1 is a fossil fuel-fired steam electric plant.

222.    Ghent Station Unit 1 is a fossil fuel-fired steam electric plant of more than 250 million BTU per hour heat input.

223.    Ghent Station Unit 1 emits SAM.

224.    SAM is a regulated pollutant under Kentucky's PSD program.

225.    In 2002, KU filed a minor permit revision with the state to install a selective catalytic reduction devices ("SCR") in Unit 1.

226.    In the 2002 permit revision, KU did not include any analysis of whether installing the SCR at Unit 1 would increase SAM emissions.

227.    KU installed the SCR in Unit 1 in 2004.

**Claim 7(A): SCR Installation Unit 1 Violate the PSD Regulations and SIP**

228.    The installation of the SCR at Ghent Station Unit 1 was a "physical change or change in the method of operation which would result in a change in actual emissions" at Ghent Station Unit 1.  401 KAR 51:0001, Section 1 (52)(b).

229.    The installation of the SCR at Ghent Station Unit 1 resulted in an annual increase in SAM emissions from Ghent Station Unit 1.

230.    The "net emissions increase" of SAM was the result of "an increase in actual emissions from a particular change or change in method of operation" or was the result of "any other increases and decreases in actual emissions . . . that are contemporaneous with the particular change and are otherwise creditable."  401 KAR 51:001 § 1.

231.    The installation of the SCR at Ghent Station Unit 1 resulted in an annual increase in SAM emissions from Ghent Station Unit 1 of more than 7 tons per year.

232.    KU did not obtain a PSD or pre-construction permit from Kentucky prior to installing the SCR at Ghent Station Unit 1.

233.    KU installed the SCR at Unit 1 without a proposed PSD permit or PSD permit determining if potential Ghent Station Unit 1 emissions of SAM would increase by 7 tons per year or more.

234.   KU installed the SCR at Unit 1 without a proposed PSD permit or PSD permit revision stating that Ghent Station Unit 1 would meet Kentucky's best achievable control technology (BACT) requirements for SAM emissions.

235.   KU installed the SCR at Unit 1 without a revised Title V permit stating that Ghent Station Unit 1 would meet Kentucky's best achievable control technology (BACT) requirements for SAM emissions.

236.   KU violated the Prevention of Significant Deterioration standards ("PSD") set forth in Kentucky's SIP at Ghent Station at 401 KAR 51:017.

237.   Each day that KU operates Ghent Station Unit 1 without a PSD permit, KU violates the PSD standards set forth in Kentucky's SIP at 401 KAR 51:017.

### Claim 7(B): KU's Failure to Amend the Title V Permit for the

### SCR at Unit 1 Violate Title V of the CAA

238.   KU installed the SCR at Unit 1 without obtaining a revised Title V permit in compliance with PSD regulations.

239.   KU did not obtain a revised Title V permit prior to installing the SCR at Ghent Station Unit 1.

240.   KU violated Title V of the Clean Air Act.

241.   Each day that KU operates Ghent Station Unit 1 without a revised "Air Quality Permit," KU violates Kentucky law.

242.   Each day that KU operates Ghent Station Unit 1 without a Title V permit, KU violates Title V of the Clean Air Act.

### Conclusion of Seventh Claim for Relief

243.     Pursuant to Clean Air Act Section 113(b), 42 U.S.C. section 7413(b), for each violation referred to in the preceding paragraphs of this claim for relief, KU is subject to injunctive relief and civil penalties of up to $32,500 per day for each violation occurring on or after March 15, 2004, and $27,500 for each violation occurring prior to March 15, 2004.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, the United States of America, respectfully requests that this Court:

A.     Permanently enjoin Defendant from further violations of the Clean Air Act and applicable requirements established thereunder, including provisions of the Kentucky SIP described above;

B.     Require Defendant to obtain and comply with all necessary permits and to undertake and complete expeditiously all actions necessary to achieve and maintain compliance with the Clean Air Act and applicable requirements established thereunder, including provisions of the Kentucky SIP described above;

C.     Assess civil penalties against Defendant for violations of applicable provisions of the Clean Air Act as well as their implementing regulations and permits issued thereunder of up to $27,500 per day for each violation occurring on or after January 31, 1997, and $32,500 per day for each such violation occurring on or after March 15, 2004;

D.     Require Defendant to install best available control technology at Ghent Units 1, 2, 3, and 4 to reduce emissions of sulfuric acid mist.

E.     Award Plaintiffs their costs and disbursements for this action; and

F.     Grant Plaintiffs such other relief as the Court may deem just and proper.

33

Respectfully submitted,


IGNACIA S. MORENO
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice

s/ James W. Beers, Jr.
JAMES W. BEERS, JR.
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C.  20044-7611
(202) 305-0455
james.beers@usdoj.gov



KERRY B. HARVEY
United States Attorney
Eastern District of Kentucky

s/ Andrew Sparks
ANDREW SPARKS
Assistant U.S. Attorney
260 W. Vine St., Suite 300
Lexington, KY  40507
(859) 685-4831